2024 IL App (1st) 231107
No. 1-23-1107
Order filed January12, 2024

Sixth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| *In re* D.W., D.W., and D.W., minors | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| (THE PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | |
| Petitioner-Appellee, | ) | Nos. 17 JA 967, 17 JA 965, 17 JA |
| | ) | 966 |
| v. | ) | |
| | ) | |
| LISA W., | ) | The Honorable |
| | ) | Demetrios Kottaras, |
| Respondent-Appellant). | ) | Judge, presiding. |

JUSTICE HYMAN delivered the judgment of the court.
Presiding Justice Johnson and Justice C.A. Walker concurred in the judgment.

**ORDER**

*Held*: The trial court's finding that the mother of minor children was unfit and in the best interests of the children her parental rights should be terminated was not against the manifest weight of the evidence.

¶ 1    In 2017, three brothers, Dam., Dav., and De., then 9, 7, and 4 years old, were taken into the custody of the Illinois Department of Children and Family Services due to multiple new and old abrasions on their bodies indicating abuse. The children told medical personnel that

their mother, Lisa W., who adopted them in 2015, caused their injuries. Lisa was arrested and pleaded guilty to aggravated battery. She admitted to hitting the boys but claimed it occurred only once. The trial court stayed all visitation until recommended by the children's therapists.

¶ 2    In 2021, the therapist for Dav. and De. determined they were ready to receive letters and prerecorded videos from Lisa. The two boys also visited her virtually in July of that year. But both boys emotionally regressed after the virtual visit, and their therapist recommended returning to letters and prerecorded videos. Lisa, who was upset about the decision, stopped communicating with the boys for several months. The oldest, Dam., who lives in a different foster home, has refused all contact with Lisa since 2017.

¶ 3    In May 2022, the State filed motions to terminate Lisa's parental rights and to appoint a guardian with the right to consent to adoption for the three children. After a hearing, the trial court found Lisa was unfit because she (i) committed extreme or repeated cruelty to the children, (ii) failed to protect them from conditions injurious to their welfare, (iii) behaved in a depraved manner, and (iv) failed to make reasonable effort or progress toward the children returning home. The court further found terminating Lisa's parental rights to be in the children's best interests. The court entered a permanency goal of independence for Dam. and adoption for Dav. and De., whose foster mother wants to adopt them.

¶ 4    Lisa concedes the evidence supports the trial court's unfitness finding. Still, she contends we should reverse because (i) the State impeded her progress and efforts at reunification by delaying visitation with the children for more than four years, and (ii) the trial court's best interest finding was against the manifest weight of the evidence. We disagree and affirm. The record shows the delay in visitation occurred because the children repeatedly said they did not want it. Further, the children's therapist delayed visitation and never recommended in-

person visits because of the trauma the children experienced in Lisa's care, their adverse reaction to visits with her, and Lisa's failure to acknowledge that her conduct harmed the children. Moreover, we agree with the trial court that the State proved by a preponderance of the evidence that terminating Lisa's parental rights was in the children's best interests.

¶ 5                                        Background

¶ 6        In 2015, Lisa adopted three boys, Dam., Dav., and De. when they were six, four, and three years old, respectively. (The children, who are biological siblings, have no adoptive father. Lisa is married but separated from her husband in1997.) On September 21, 2017, the State filed petitions for adjudication of wardship, alleging the children were neglected due to injurious environment and abused based on physical abuse and substantial risk of physical injury. The State asserted that a DCFS investigator found the children had multiple scars, abrasions, and loop and linear marks on their bodies that, according to medical personnel, were consistent with abuse. The trial court granted the petitions, and the children were taken into temporary custody by DCFS.

¶ 7        Lisa was arrested and, in 2018, pleaded guilty to three counts of aggravated battery of a child and sentenced to two years' probation.

¶ 8        On April 23, 2018, the guardian *ad litem* filed an emergency motion asking the trial court to amend the visitation order so that the children would not be required to visit with Lisa against their will and visits would resume only on a recommendation by the children's therapists. The motion asserted that the assigned social services agency, Lutheran Social Services of Illinois (LSSI), found that the children were engaging in behaviors as a result of their mother's abuse, and two of the children said they did not want to visit with her.

¶ 9    In response, Lisa filed a motion arguing, in part, that LSSI was unreasonably barring her access to the children. She asked the trial court to (i) remove LSSI and assign a new service provider, (ii) order that the children's current placement is unnecessary, and (iii) deny the GAL's motion to suspend visitation and order the assigned agency to begin supervised visits.

¶ 10   The trial court ordered that both the children and Lisa engage in therapy. The court denied in-person visits and allowed Lisa to prepare recordings for the children to be played in the presence of their therapist. The court stated that therapeutically supervised visits could begin when the therapist believed appropriate, and the children wanted them.

¶ 11   After an adjudicatory hearing, the trial court found the children to be neglected due to injurious environment (705 ILCS 405/2-3(b) (West 2022)), physical abuse (705 ILCS 405/2-3(i) (West 2022)), and excessive corporal punishment. (705 ILCS 405/2-3(2)(v) (West 2022)), based on a stipulation of facts regarding Lisa's battery conviction and injuries seen by DCFS caseworkers and medical personnel on the children's bodies indicating abuse. The trial court adjudged the children wards of the court, determining that Lisa was unable to care for, protect, train, or discipline them for a reason other than financial circumstances. The court found that reasonable efforts had been made to the prevent removal of the children from the home and services aimed at family preservation and reunification had been unsuccessful. The court found removal from Lisa's home and placement in the guardianship of DCFS to be in the children's best interests. The court set a permanency goal of return home in 12 months, noting that the children were in services and improving, and Lisa was in services, though "minimizing" her responsibility for the abuse.

¶ 12   The permanency goal of return home in 12 months remained until February 2022, when the trial court changed the permanency goal to substitute care, pending determination on

termination of parental rights. The court noted a lack of progress and the best interest of the minor children. The State filed a motion to appoint a guardian to consent to adoption for all three boys, alleging Lisa was unfit for (i) extreme and repeated cruelty to the children (750 ILCS 50/1(D)(e) (West 2022)), (ii) failing to protect the children from conditions in their environment injurious to their welfare (750 ILCS 50/1(D)(g) (West 2022)), (iii) behaving in a depraved manner (750 ILCS 50/1(D)(i) (West 2022)), and (iv) failing to make reasonable efforts to correct the conditions that were the basis for removal or reasonable progress toward return of the children within nine months after adjudication of neglect, abuse or dependency or within any nine months after that finding. (750 ILCS 50/1(D)(m) (West 2022)).

¶ 13                                Termination Trial

¶ 14        A proceeding to terminate a party's parental rights under the Juvenile Court Act of 1987 (705 ILCS 405/11 *et seq.* (West 2022)) occurs in two stages. First, the State must establish the parent is "unfit to have a child" under one or more of the grounds in the Adoption Act. *In re D.T.*, 212 Ill. 2d 347, 352 (2004); see 750 ILCS 50/1(D) (West 2022) (setting out bases for finding of unfitness). At the unfitness hearing, the State has the burden of proving the parent's unfitness by clear and convincing evidence. *In re D.T.*, 212 Ill. 2d at 352-53; 705 ILCS 405/2-29 (West 2022)). The heightened burden of proof arises because "the right of parents to control the upbringing of their children is a fundamental constitutional right." *In re D.W.*, 214 Ill. 2d 289, 310 (2005); see also *In re Shauntae P.*, 2012 IL App (1st) 112280, ¶ 88 ("Because the termination of parental rights constitutes a complete severance of the relationship between the parent and child, proof of parental unfitness must be clear and convincing.").

¶ 15        If the trial court finds unfitness, the proceedings advance to the second stage, where the court determines whether termination of the parent's rights is in the minor's best interests. *In*

*re D.T.*, 212 Ill. 2d at 352. Once the State proves parental unfitness, the focus shifts to the child, and the interests of parent and child diverge. *In re D.W.*, 214 Ill. 2d at 315. The preponderance-of-the-evidence standard is the burden of proof in the best interests hearing. *Id*.

¶ 16                                        Unfitness Hearing.

¶ 17        Before beginning the unfitness hearing, the trial court took judicial notice of the adjudication order from June 2018, finding neglect and injurious environment, physical abuse, and abuse/substantial risk of injury and excessive corporal punishment. The court also took judicial notice of the disposition order entered on September 14, 2018, the termination petition filed on May 31, 2022, and the State's pleading under section 50/1(D)(m) of the Adoption Act (750 ILCS 50/1(D)(m) (West 2022)), alleging six different nine month periods in which Lisa failed to make reasonable efforts to correct the conditions that served as the basis for removal.

¶ 18                                             Exhibits

¶ 19        The State admitted 31 exhibits into evidence, including photos showing the marks found on the children, interviews with the children, and medical records indicating physical abuse was suspected. The State also admitted nine family service plans dating from September 2018 through September 2022, numerous Child Family Therapy summaries, a copy of Lisa's criminal disposition for aggravated battery, her psychological assessment from May 2018, evaluations from CCJCC addressing visitation, and records from Lisa's therapist.

¶ 20        The September 12, 2018, family service plan stated the case was opened because Dav. had welts on his arms, legs, torso, and back and told his teacher that his mother had whipped him with an iPad charger cord. Dam. also had injuries. The plan stated that Lisa minimized her role in abusing the children. She requested visitation, but the children did not want to see her. A June 2018 court order granted Lisa visitation if recommended by the children's therapist, the children wanted to visit, and a therapist supervised. The children lived in the same foster home

after staying at a relative of Lisa's until concerns were raised about the relative's ability to keep the boys safe from Lisa. The permanency goal was set at return home within 12 months.

¶ 21 A CCJCC report dated November 30, 2018, stated that the children had told professionals they did not want to see Lisa or return to her care. In describing Lisa's abuse, Dam. said she would hit him with an extension cord that left marks on him, not feed them, so they went to bed hungry and she let her husband almost kill him by choking and punching him in the throat. Dam. said he was afraid of Lisa and her husband and had no happy memories of living with her. Dav. also described being fearful of Lisa. According to the report, whether to allow therapeutic visits was difficult to determine, and the benefit of visits did not outweigh the potential harm given the children's emotional reaction to seeing her again.

¶ 22 A March 2019 family service plan indicated that the children were not ready to visit with Lisa. The Plan stated that "[d]espite efforts by the therapist to prepare the *** minors for parent/child visits with [Lisa], the minors have not expressed interest in visits. Efforts to prepare them for visits will continue, and therapeutic visits will start if/when the therapist determines the minors are ready and willing to visit."

¶ 23 Services plans from September 2019 and March 2020 stated that Lisa was participating in recommended services and had given her therapist letters and videos for the children, but they were not ready to read or view them. In addition, the children continued to tell their therapists they did not want visits with Lisa. Similarly, the September 2020 and March 2021services plans stated that the children did not want visitation, and their therapists were consulting each other to determine how to establish visits appropriately. Furthermore, Lisa had not been participating in therapy since March 2020 or providing her therapist with letters for the children.

¶ 24    According to a September 2021 family service plan, Dav. and De. began receiving letters and prerecorded video messages from Lisa in January 2021. They also had a video visit in July 2021, but afterward, their therapists suspended all communications because the boys' behavior regressed, and they struggled emotionally. Dav. and De. told their therapist they no longer wanted videos and would accept only her letters. According to her therapist, Lisa struggled with this setback, becoming fixated on her own needs and not the children's, so she stopped communicating with them. Lisa's therapist reported that Lisa "clearly does not understand the parent/child role that demands the parent support their children processing of their traumas in their own way and time without expectation that children will consider the parent's need above their own."

¶ 25    In March 2022, the permanency goal was modified to termination of parental rights.

¶ 26    Witness Testimony

¶ 27    Sean Cline, who works for Children's Place Association, testified that when he was assigned to the case in June 2019, after it was transferred from LSSI, there had been no in-person, prerecorded videos, or live video visits between Lisa and the children under the June 2018 court order. Cline said Lisa completed psychological evaluations in May 2018 and January 2019. She also completed parenting classes in March 2018 and began individual therapy in May 2018. Cline spoke with Lisa's therapist, who was unaware of the extent of Lisa's abuse and was under the impression it had been a one-time incident until Cline sent her photos and other evidence. Lisa changed therapists in September 2019 and did not participate in therapy from March to September 2020.

¶ 28    Cline testified that he spoke with Lisa by phone in September 2019. Lisa said she took the children to work in September 2017, and Dam. tried to steal food from a co-worker's purse, which embarrassed her, and she "whooped them" when they got home. She said she hit all three boys

because they knew what Dam. was doing. Lisa admitted she had gone too far but adamantly insisted it was a one-time incident despite pictures showing scarring in various stages of healing. She never sent pictures she promised Cline of the boys swimming a week before the incident, which she claimed would show no scarring.

¶ 29    Cline said he was concerned about Lisa's lack of knowledge regarding the abuse, minimizing its severity, frequency, and history. He said her statements were contradictory— while she would acknowledge the abuse, she claimed to have done nothing to hurt the boys.

¶ 30    In 2019, De. told Cline that Lisa would bite his arm, make him smell her bad breath, and hit him with an extension cord. He told Cline that her boyfriend was even meaner and hit him a lot. Cline said the children's case file contained contradictory information about Lisa's husband. Cline's understanding was that they were separated, but De. seemed frightened of the husband and claimed he had physically abused him.

¶ 31    As to visitation, Cline said his agency adopted the recommendations of the CCJCC, requiring collaboration between the children's and Lisa's therapists to determine what would be safe for the children. In January 2021, the therapists agreed that Dav. and De. were emotionally ready to start exchanging letters and prerecorded videos with Lisa. The children's therapist first reviewed the letter or video and, if deemed appropriate, would share it with the children during a session. On cross-examination, Cline acknowledged that Lisa began writing letters to the children in November 2018, but they refused them until January 2021. Cline stated that the agency did not withhold the letters from the children, and the children's therapists decided when they were emotionally ready for them.

¶ 32    In July 2021, Lisa visited virtually with Dav. and De. with their therapist present. After, the children told the therapist they were distressed and did not want virtual visits. Dav. and De. also began showing regressive behavior at school. The therapist discontinued virtual visits but

allowed prerecorded video visits and letter exchanges because the boys said they were open to it. Lisa did not resume writing letters or making videos until December 2021. According to Lisa's therapist, she was "stuck in her own feelings and how this was affecting her instead of realizing the impact her behaviors were having on the boys." Cline acknowledged Lisa was likely disappointed that the children asked to stop virtual visits, but he found the five-month period in which Lisa failed to communicate with Dav. and De. to show a lack of understanding about how her behavior affected the boys. Virtual visits between Lisa and Dav. and De. resumed in July 2022 and occurred sporadically, about once a month. Cline said he did not ask the boys about the visits and was unaware of issues or concerns.

¶ 33    Cline agreed that Lisa consistently attended weekly therapy and attempted to address her treatment goals. He also acknowledged Lisa was willing to engage in additional services, including family therapy, parent/child psychotherapy, and parent coaching, but those services were not available to her absent in-person contact with the children. Nonetheless, Cline believed Lisa had not made substantial progress in taking responsibility for her physical abuse or understanding how her actions and behavior have affected the children and how to respond to the trauma they experienced in her care positively.

¶ 34    Darcy Boyd, a DCFS investigator, was assigned on September 14, 2017, after receiving a hotline call regarding Dav., then seven years old. Boyd met Dav. at his school on September 19. She asked him to remove his shirt and saw old and new marks on his arms, torso, and back. Dav. told her Lisa caused the marks. Boyd also met then-nine-year-old Dam. who attended the same school and saw similar marks on him. Boyd said Dam. was crying but would not tell her how he got the marks.

¶ 35      Boyd said that the children's injuries were significant. After talking to her supervisor, she took the boys into protective custody. At a hospital, she saw additional injuries, and the boys told Boyd they had a younger brother, De. The next day, with police assistance, Boyd removed De. from Lisa's home and took him into protective custody. Boyd saw loop marks on his torso. Boyd said Lisa acknowledged hitting the boys with a stick, describing it as discipline and not abuse. In evidence are photos taken at the hospital showing loop marks and linear marks on the children's legs, backs, arms, and torso in various stages of healing.

¶ 36                              Lisa's Testimony

¶ 37      After the State rested, Lisa testified that the children were placed with her in 2014, and she adopted them in 2015. She first used corporal punishment in 2017. She admitted to hitting them more than once and said she had remorse, and apologized to the children repeatedly. Lisa also told them they have a right to be angry at her for what she did.

¶ 38      Regarding services, Lisa testified that she completed a psychological assessment, engaged in therapy, completed a Juvenile Court Clinic evaluation, parenting classes, a psychiatric evaluation, and domestic violence counseling. She said she missed therapy from March to September 2020 due to the COVID pandemic and because of her and her mother's health issues, but she has been consistently attending therapy since September 2020. Lisa was willing to participate in other recommended services, including parent coaching and family therapy, but they were not offered to her because the children were not ready for them yet. Lisa said she participated in all child and family team meetings and administrative case reviews. She kept in contact with the assigned caseworkers and consistently requested visits.

¶ 39      Lisa had no in-person visits with the children since they were taken into protective custody in 2017, though she repeatedly requested them. In 2018, Lisa sent letters to the children, which

they received in 2019 because they were not ready before then. She began sending videos in 2021 and received videos from Dav. and De. She never received letters or videos from Dam.

¶ 40 Lisa virtually visited with Dav. and De. in July 2021. She thought the visit went well, but virtual visits were suspended because De. had emotional problems after the visit. About two months later, she again began sending letters to Dav. and De. and sent them videos about a year later. Lisa said the delay was not to punish the boys but due to her medical issues as well as her parents' medical issues. Virtual visits with Dav. and De. resumed in July 2022 without any cancellations. But Lisa had not visited with Dam.

¶ 41 Lisa said she began using corporal punishment in 2017 because her life was "spiraling out of control." She was taking care of her parents who both had cancer and had her own medical issues and was under a lot of stress, which she did not handle well. On cross-examination, Lisa acknowledged that DCFS hotline calls were made in 2016 regarding Dam.'s welfare, and DCFS opened an investigation into her physical abuse of Dam. Lisa said she separated from her husband in 1997, but he continued coming to her house to visit their two biological children. She denied that her husband used corporal punishment on Dav. Dam., or and De. and said she would have stopped him if he had.

¶ 42 Lisa acknowledged she pleaded guilty to aggravated battery of a child and was placed on probation for to two years. Lisa denied telling Sean Cline that she hit the boys on only one occasion; she admitted she hit De. more than once and hit Dav. and Dam. more than she hit De. Lisa said the children's wounds never led to bleeding and denied hitting De. on the face with a stick, biting the boys, or burning them. Shortly before the boys were taken into protective custody, De. fell off his bike at daycare, causing a scar on his face.

¶ 43                                      Unfitness Findings

¶ 44      After considering the evidence and testimony, the trial court found Lisa was unfit because she (i) committed extreme or repeated cruelty to the children based on the "multiple whupping marks" on the children, (ii) failed to protect them from conditions injurious to their welfare, (iii) behaved in a depraved manner, and (iv) failed to make reasonable effort or progress toward the children returning home. The trial court stated that the photographs admitted into evidence were "beyond offensive" and "demonstrate the degree of violence." The trial court also considered the children's "hesitation in having a continued relationship with their mother." The court found that Lisa had not made reasonable progress, given that the children were afraid of her and did not want to meet or communicate with her.

¶ 45                          Best Interest Hearing

¶ 46      Lisa did not appear at the best interest hearing. The trial court took judicial notice of the unfitness evidence and findings. The State again called Sean Cline, who testified that 15-year-old Dam. lived with his paternal great aunt since March 2021. He has an IEP and takes medication for ADHD and Major Depressive Disorder. Dam. had been diagnosed with PTSD with dissociative symptoms and was seeing a psychiatrist. He had been waitlisted for therapy and received trauma-focused therapy in the past. He was hospitalized for two weeks for suicidal ideation and was taken to the emergency room after ingesting too much edible marijuana. Cline said this was not Dam.'s first use of marijuana and opined that Dam. could benefit from substance abuse services.

¶ 47      Cline testified that Dam. was having instability issues because his foster parent was not following agency recommendations requiring supervised visits with his biological mother. Dam. was going on his own to see his biological mother, who told Cline she did not want to deal with Dam. because he was disrespectful. His foster parent also was not following the

13

agency's recommendations on preparing Dam. for adulthood. So, the agency was exploring other placement options. Dam., a freshman in high school, was failing in three classes, frequently tardy, and missing assignments. The agency recommended terminating Lisa's parental rights to Dam., whom she had had no contact with since 2017. Dam. claimed Lisa tried to kill him, and he had no interest in a relationship with her now or in the future and wanted her parental rights terminated.

¶ 48      Cline testified that Dav. had been in the non-relative foster home of Catherine B. since May 2019, along with De., who arrived in November 2019. De., who had been receiving trauma therapy since 2018, took medication for ADHD. De. had made progress since moving to his foster home and maintained good grades, though he exhibited disruptive behavior. Lisa had withheld food from the children, and Dav. and De. hide food under their beds and take things at home and school that did not belong to them. De.'s teacher frequently contacted his foster mother to discuss his behavior, but he was improving.

¶ 49      Dav. has asthma and an inhaler. He also has DiGeorge Syndrome, caused by the deletion of a small segment of Chromosome 22, so he has a small stature and some developmental delay issues. He was not currently taking medication but was being monitored annually at Lurie Children's Hospital's DiGeorge Clinic. Dav. has an IEP and is doing well in school. Dav. and De. see their foster mother as their primary caregiver, are attached to her, and want her to adopt them. Cline opined that the foster mother provides a sense of security, stability, and permanency and ensures their needs are met. They have a loving relationship, and adoption by Catherine B. would be in the boys' best interests.

¶ 50      Foster parent Catherine B. testified that Dav. and De. have been living with her since 2019, and she wants to adopt them. She said the boys are part of her family, and she loves them. She

14

has another adopted son of 10 years, Jaylen, who was 13 years old. Jaylen has cerebral palsy and requires help, but Catherine B. is retired and has time to take care of him. Jaylen also has a DHS-provided personal assistant, and Dav. and De. help out by playing with Jaylen. Catherine B. recently had skin cancer currently in remission. If Catherine B. could not care for Dav. and De., her sister would become their primary caretaker. She also has a strong support system and family members who live nearby and are available to help.

¶ 51                                    Best Interest Ruling

¶ 52        After closing arguments, the trial court found the State proved by a preponderance of the evidence that the children's best interests were in terminating Lisa's parental rights. The court said that although Dam. was not currently in a pre-adoptive home, "he is suffering with the impact of the abuse. *** It is very clear*** there should be a termination of parental rights. And it is in [Dam's] best interest." As to Dav. and De., the court found "the quality of life that [Catherine B.] has provided these two children has been excellent, and I believe she's on the path to continuing to do that." The children "have a support system, *** they are loved and they are a part of a family and extended family." The court concluded terminating parental rights was in Dav.'s and De.'s best interest.

¶ 53        At the permanency hearing, caseworker Sean Cline testified that his agency was recommending a permanency goal of independence for Dam. based on his current foster placement with his great aunt and his interest and willingness to work toward that goal. The agency was recommending a permanency goal of adoption for Dav. and De. because they have a stable, nurturing foster home and want to be adopted by Catherine B. The trial court agreed and entered the permanency orders Cline recommended.

¶ 54                                        Analysis

¶ 55                                    Best Interest Finding

¶ 56        Lisa concedes her use of corporal punishment was sufficient to support the trial court's

unfitness finding under subsections (e) and (i) of the Act. Thus, she has forfeited issues related

to the unfitness finding. *In re H.S.*, 2016 IL App (1st) 161589 ¶ 36. See also Ill. S. Ct. R.

341(h)(7) (eff. Oct. 1, 2020) ("Points not argued [in appellant's brief] are waived and shall not

be raised in the reply brief, in oral argument, or on petition for rehearing."). Instead, she

contends that (i) the delay in visitation warrants reversal of the best interest finding and (ii) the

best interest finding was against the manifest weight of the evidence.

¶ 57        When the trial court finds a parent unfit under one of the grounds of section 1(D) of the

Adoption Act, it must determine whether termination of parental rights is in the best interests

of the child under 1-3 (4.05) of the Juvenile Court Act (705 ILCS 405/1-3(4.05) (West 2022)).

At a best interests hearing, the parent's interest in maintaining the parent-child relationship

yields to the child's interest in a stable, loving home life. *In re D.T.*, 212 Ill. 2d at 364. The

child's best interest is the paramount consideration to which no other takes precedence. *In re

Austin W.*, 214 Ill. 2d 31, 46 (2005). The State bears the burden of proving that termination of

parental rights and adoption is in the child's best interests by a preponderance of the evidence.

*In re D.T.*, 212 Ill. 2d at 366. We will not disturb a trial court's best interests finding unless it

is against the manifest weight of the evidence. *In re B'yata I.*, 2014 IL App (2d) 130558-B, ¶

41. A decision is against the manifest weight of the evidence if the facts clearly demonstrate

that the court should have reached the opposite result. *In re N.B.*, 191 Ill. 2d 338, 346 (2000).

The sufficiency of the evidence in a termination-of-parental-rights case depends on the

particular facts and circumstances presented. *In re G.L.*, 329 Ill. App. 3d 18, 26 (2002).

Because the grounds for unfitness are independent of one another, we may affirm the judgment

if the evidence supports any of the trial court's grounds of unfitness. *In re Addison R.*, 2013 IL App (2d) 121318, ¶ 35 (single ground of unfitness sufficient to support finding of unfitness).

¶ 58    In determining a child's best interests, the trial court considers 10 factors in section 1-3(4.05) of the Juvenile Court Act of 1987: (i) the physical safety and welfare of the minor, including food, shelter, health, and clothing; (ii) the development of the minor's identity; (iii) the minor's background and ties, including familial, cultural, and religious; (iv) the minor's sense of attachments; (v) the minor's wishes and long-term goals; (vi) the minor's community ties, including church, school, and friends; (vii) the minor's need for permanence, including his or her relationships with parent figures, siblings, and other relatives; (viii) the uniqueness of every family and child; (ix) the risks attendant to the minor entering and being in substitute care; and (x) the preferences of the persons available to care for the minor. 705 ILCS 405/1-3(4.05) (West 2022). The trial court "is not required to explicitly mention, word-for-word," the statutory factors. *In re Janira T.*, 368 Ill. App. 3d 883, 894 (2006). In addition to these factors, the trial court may consider the nature and length of the child's relationship with his or her present caretaker and the effect that a change in placement would have on the child's emotional and psychological well-being. *In re Jaron Z.*, 348 Ill. App. 3d at 262.

¶ 59    Lisa argues the State's handling of the case warrants reversal of the best interest finding. Specifically, she contends the State, through the assigned agency and caseworker, is responsible for a three-year delay between the 2018 visitation order and her first virtual visit in 2021, which prevented her from making progress in reunifying with the children.

¶ 60    Lisa relies on *In re Interest of Overton*, 21 Ill. App. 3d 1014 (1974) for support. In *Overton*, the appellate court overturned the trial court's finding that a mother was unfit because she failed to maintain a reasonable degree of interest, concern, or responsibility for her children's

welfare. The court held that the finding was "not based upon clear and convincing evidence" because the mother had shown interest, concern, and responsibility as to her children's welfare, but DCFS had sabotaged or frustrated her efforts. *Id.* at 1019. The mother sent a gift to her children, but DCFS never delivered it. She wrote a letter to DCFS, which did not respond. *Id.* "If [the mother] did not see her children frequently enough, the Department was prepared to and did file a petition alleging that [the mother] did not show reasonable interest, yet, if she insisted upon seeing her children in opposition to the feelings of her case worker, her case worker may not have recommended the return of her children." *Id.* In short, the mother made reasonable efforts, and the DCFS failed to meet her halfway "virtually ensur[ing] that once [the mother] was separated from her children she would eventually lose them permanently." *Id* .

¶ 61        Lisa asserts that, as in *Overton*, the State hindered her efforts at reunification and "virtually ensured" her parental rights would be terminated by refusing to facilitate her visitation with the children for three years. We disagree. *Overton* is distinguishable as it involved an unfitness finding rather than a best interest finding. Further, *Overton* did not involve physical abuse, nor did the children indicate they wanted no contact with their mother.

¶ 62        Furthermore, the record does not show the State hindered visitation. Rather, the evidence shows the children's wishes and the recommendations of their therapists guided visitation. CCJCC evaluated the children and decided, based on the trauma during Lisa's care, that visits should not occur until the children wanted them and their therapists deemed them appropriate. Despite the efforts of the children's therapists to prepare them for a visit, they remained adamant for years that they wanted no contact with her. The family service plans introduced into evidence document the children's fear of Lisa and repeated refusal to have visits with her.

Dam. refused all contact with Lisa since the case began, and not until January 2021 did Dav.'s and De.'s therapist deem them ready to receive letters and prerecorded messages from Lisa. They then met with Lisa virtually in July 2021 but struggled emotionally afterward, prompting their therapist to stop virtual visits and resume letters and prerecorded messages. Lisa chose not to send letters or videos for five months because, according to her therapist, she was upset with the decision.

¶ 63    Lisa notes that the State did not call the therapists to testify at the best interests hearing. The State was not required to call the therapists, as the record documents their findings and recommendations. Moreover, Lisa could have called the therapists to testify if she believed they were not working to restore the bond between her and the children and actively thwarted efforts at reunification. In short, the record shows the children's caseworker and therapists attempted to restore the relationship and facilitated communication with Lisa through letters, videos, and, eventually, virtual visits. Nonetheless, for years, the children wanted no contact. Although Dav. and De. progressed to some contact, they never wanted in-person visits, and their therapists never found them emotionally ready for in-person visits.

¶ 64    We also disagree with Lisa's alternative argument that the trial court's best interest finding was against the manifest weight of the evidence because the State did not present testimony regarding the eight-month period between November 2022 and June 2023, when she had virtual visits with Dav. and De. Even assuming those visits went well, they do not provide grounds for reversing the trial court's finding that termination was in the children's best interest. Notably, the trial court heard caseworker Cline testify about the recent virtual visits, which he said occured sporadically without any issues or concerns. So, the trial court could consider those visits in its best interest finding.

¶ 65    Moreover, the evidence supports the court's finding. Dav. and De. have been placed in a safe, loving, happy, and appropriate foster home. They are bonded to their foster mother, who provides for all their needs. The foster mother testified that she loves the boys and wants to adopt them. The boys are well integrated into the family and extended family; they love their foster mother and want her to adopt them. As to Dam., he was 15 years old and has refused all contact with Lisa since 2017. The photos of his injuries show the extensive abuse he endured; he said he believes she tried to kill him and never wants to see her again. Although Dam., unlike his brothers, is not in a pre-adoptive home, given the extent of the abuse and the absence of a relationship with Lisa for more than five years, the trial court's finding that termination of parental rights was in his best interest was not against the manifest weight of the evidence.

¶ 66    The State recommended Lisa's parental rights be terminated. Lisa did not attend the hearing and thus did not testify on the issue of termination of her parental rights. The children's cases have been in the court system for six years, during which time Lisa has never had an in-person visit with them because the children did not want them, and their therapist had not recommended them. As a result, the children could not be safely returned to her custody any time soon. It was in the children's best interests to have the stability and permanency that their adoption by the foster parent could afford. *In re D.F.*, 208 Ill. 2d 223, 231 (2003) (purpose of the Juvenile Court Act is to secure permanency for minors who have been removed from custody of their parents "at the earliest opportunity." 705 ILCS 405/1-2(1) (West 2022)). Thus, we affirm the trial court.

¶ 67    Affirmed.